*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DONNA LIVINGS,

        Plaintiff-Appellee,

v

SAGE'S INVESTMENT GROUP, LLC,

        Defendant-Appellant,

and

T & J LANDSCAPING & SNOW REMOVAL,
INC., and GRAND DIMITRE'S OF
EASTPOINTE FAMILY DINING,

        Defendants.

UNPUBLISHED
February 26, 2019

No.  339152
Macomb Circuit Court
LC No.  2016-001819-NI

Before:  TUKEL, P.J., and BECKERING and SHAPIRO, JJ.

PER CURIAM.

In this premises liability action, defendant Sage's Investment Group, LLC, appeals by leave granted[1] the trial court's order denying its motion for summary disposition.  Defendant contends that it did not have possession and control of the premises upon which plaintiff, Donna Livings, slipped and fell, and that regardless, the hazard at issue was not effectively unavoidable; thus, it owed no duty to plaintiff.  Upon careful review of the entire record in the light most favorable to plaintiff, we affirm the trial court's ruling and remand for further proceedings.

---

[1] *Donna Livings v Sage's Investment Group, LLC*, unpublished order of the Court of Appeals, entered October 3, 2017 (Docket No. 339152).  Neither of the other defendants is involved in this appeal. Therefore, we will refer to Sage's Investment Group, LLC, as defendant in this opinion.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

This case stems from plaintiff's February 21, 2014, slip and fall in defendant's parking lot. Defendant leased a portion of a plaza on the premises at issue to Grand Dimitre's of Eastpointe Family Dining (Dimitre's), which operated a restaurant. Plaintiff worked as a food server at Dimitre's, where she had been employed for approximately ten years before her fall.

According to her deposition testimony, on the day of the incident plaintiff arrived by car at around 5:50 a.m. in order to work the opening shift. She proceeded toward the "rear" parking lot where employees were required to park and where they were let in every morning, as the front door was locked. She observed that fellow server Debra Buck's car was already in the parking lot. Plaintiff parked approximately 70 feet from the back door, which was the closest available spot. The other spots closer to the door were "piled up with snow" because the snowplow had pushed snow onto those spots. She testified that every time it snowed, the snowplow would plow the new snow in the parking lot, but it would not plow down to the cement, causing ongoing concerns:

> Originally, like when the snow first started, they plowed. Everything went up against the wall [there is a brick wall by the back door]. Then the snow would come, but they wouldn't come until, you know, 10:00 o'clock in the morning, so all of the cars and everything coming in would start packing the snow down. So when they would come to plow, they would only plow whatever was brushed up, so the rest was - then the next two days, whenever it snowed again, it would snow and cars are coming in and you kept getting these ruts packing this stuff down. They never scraped to the bottom, so it just kept accumulating over time.

She also testified that the parking lot was never salted after being plowed, which contributed to the problem.[2]

When she arrived on the morning of her fall, plaintiff could not see any pavement in the parking lot due to the accumulation of approximately six inches of "packed" snow that had been "flattened" to the ground by vehicles and the snow plow over the course of two months of snowfall. The result was that the parking lot was "one big block of ice" and "trodden" ground, with no fluffy snow on top. Plaintiff described the resulting appearance of the "whole parking lot" as "[a] sheet of white ice," a "solid block," and as "a solid sheet of white. Whether it be

---

[2] Anthony Caramagno, II, the owner of T & J Landscaping and Snow Removal, Inc., testified at his deposition that the parking lot at issue is one lot that surrounds the whole complex. He plowed the parking lot for free as a favor to his close friend, Jim Sage—defendant's sole owner. Their agreement was that he would provide snowplow services after 1.5 inches of snowfall. Caramagno testified that he would only salt if Sage asked him to do so, and that if a particular person pays for salting, "whatever residual of snow there is after I'm done plowing, it will melt that snow or ice, or whatever seems to be there at that time, down to the surface." According to his records, Sage did not ask him to and he did not salt either the parking lot or the sidewalk on the property in question at any time from January through March of 2014. At his deposition, Sage testified that he expected Caramagno to salt the parking lot whenever it needed salting.

packed snow or ice I have no idea." According to plaintiff, the employees "complained all the time" to Dimitre's owner, saying that "the parking lot needed to be done correctly." Some mornings the customers would complain.

Buck testified at her deposition that on the morning of plaintiff's fall, the parking lot was "a sheet of ice with water on top. Snow, ice, water." From what she remembered, there was "snow, ice and water pretty much through the parking lot." When asked if any part of the parking lot did not have that condition present, she responded, "No, it was covered." And so was the sidewalk. She did not recall seeing any salt on the parking lot. Buck had difficulty walking to the restaurant from her car, so she had to "shimmy" her way to the front entrance, where she entered with "Chef Bob," who possessed the front door key.

A photograph of the parking lot[3] reveals that the "rear" parking lot is essentially to the right side of, or adjacent to, the front parking area where customers would commonly park:



After taking three steps upon exiting her car, plaintiff fell, injuring her lower back. She tried to get up, but she was "slipping everywhere," so she got down on her hands and knees and crawled across the parking area. She tried to get to the back door, but she could not, so she "ended up walking the snow drift, plowed area, whatever you want to call it" around the building to the front entrance. She called the restaurant with her cell phone when she got to the front

---

[3] The photograph was not taken on the day of plaintiff's fall. Plaintiff provided a copy of the photograph to the trial court in her brief in opposition to defendant's motion for summary disposition, and it was referred to in various depositions.

door, and Buck answered the phone and opened up the front door for her. Buck testified that plaintiff was soaking wet from the waist down after her fall.[4]

Plaintiff testified that when the pain caused by the fall did not subside by the following day, she decided to seek evaluation and treatment. She was diagnosed with a lower back injury that ultimately required three surgeries, including an anterior lumbar fusion at L4-5. Plaintiff filed this premises liability action, and discovery ensued.

Defendant moved for summary disposition on the basis that the condition was open and obvious and was not effectively unavoidable because plaintiff knew that the area was snowy or icy, and she could have parked in a different location and entered through the front door. Defendant also argued that it did not exercise the requisite degree of possession and control over the premises to be held liable on a premises liability theory. Defendant contended that only the restaurant's employees and customers used the parking lot, and that the lease agreement required Dimitre's to assume the responsibility of snow removal.

The trial court denied defendant's motion, stating that whether plaintiff was permitted to park in front of the building and use the front door was a question of fact for the jury given plaintiff's testimony that employees were required to park in the back and enter through the back door. The court noted plaintiff's testimony that the snow removal process always left a coating of snow and ice in the parking lot. Regarding possession and control of the property, the court reasoned that defendant, rather than Dimitre's, had contracted with T & J Landscaping & Snow Removal, Inc. ("T & J") for snow removal services and that Dimitre's did not assume the responsibility for snow removal simply by salting the sidewalk in the area where the front entrance was located.

Defendant filed this interlocutory application for leave to appeal, reasserting its arguments made in the trial court, which this Court granted.

## II. POSSESSION AND CONTROL OF PREMISES

Defendant first argues that it cannot be held liable for plaintiff's injuries because it was not in possession and control of the parking lot when plaintiff fell. We disagree.

---

[4] According to his deposition testimony, Ayman Shkoukani, an owner of Dimitre's, arrived at 9:00 a.m. on the day of plaintiff's fall. He testified that plaintiff told him she had fallen in the back parking lot on her way in to work. Shkoukani went to the rear parking lot and realized that water was not draining through the sewer grate. The water was up to his ankle, and his foot was "soaked." He testified: "I think like the drain line, the city line, it was like covered with ice, you know, leaf plus ice. . . . I think it was a sheet of ice underneath—underneath the water. He said he used sticks in an effort to unblock the grate, and the water drained through the grate. Plaintiff testified that she does not know if she slipped near the drain because she could not see the drain, and Shkoukani's actions did not clear the entire back lot, just near the drain. Buck similarly testified that when she left at the end of her shift, there was still snow and ice in the back parking lot.

This Court reviews the grant or denial of a motion for summary disposition de novo. *Value, Inc v Dep't of Treasury*, 320 Mich App 571, 576; 907 NW2d 872 (2017). Defendant moved for summary disposition pursuant to MCR 2.116(C)(10). "A motion under MCR 2.116(C)(10) tests the factual support for a claim and should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Anzaldua v Neogen Corp*, 292 Mich App 626, 630; 808 NW2d 804 (2011). A genuine issue of material fact " 'exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ.' " *Cox v Hartman*, 322 Mich App 292, 299; 911 NW2d 219 (2017) (citation omitted).

In order for a defendant to be liable under a premises liability theory for injuries caused by conditions of the land, the defendant must have legal possession and control of the premises. *Morelli v City of Madison Heights*, 315 Mich App 699, 702; 890 NW2d 878 (2016). " 'Premises liability is conditioned upon the presence of both possession and control over the land because the person in possession is in a position of control and normally best able to prevent any harm to others.' " *Id.* at 702-703 (citation omitted). A "possessor" of land is defined as:

> "(a) a person who is in occupation of the land with intent to control it or
>
> (b) a person who has been in occupation of land with intent to control it, if no other person has subsequently occupied it with intent to control it, or
>
> (c) a person who is entitled to immediate occupation of the land, if no other person is in possession under Clauses (a) and (b)." [*Orel v Uni-Rak Sales Co, Inc*, 454 Mich 564, 568; 563 NW2d 241 (1997), quoting *Merritt v Nickelson*, 407 Mich 544, 552; 287 NW2d 178 (1980), quoting 2 Restatement Torts, 2d, § 328 E, p 170.]

There is no dispute between the parties that defendant owned the plaza, including the parking lot. However, defendant correctly notes that ownership of the plaza is not necessarily determinative of whether it had possession and control of the parking lot. "Possession and control are certainly incidents of title ownership," but where a landlord retains title ownership to the premises and rents the premises to a tenant, the possession and control that the landlord would ordinarily retain "can be 'loaned' to another, thereby conferring the duty to make the premises safe while simultaneously absolving oneself of responsibility." *Id.*

Defendant argues that Grand Dimitre's possessed and controlled the parking lot and that Grand Dimitre's was responsible for all outdoor maintenance, based on a clause in the original lease agreement for the restaurant space in defendant's plaza. The lease agreement that covered the restaurant space was originally executed between the former owner of the plaza and the former owner of the restaurant space. The plaza's former owner sold the plaza to defendant, and as a result, defendant assumed the role of landlord with regard to the lease agreement that belonged to the former owner of Dimitre's restaurant space. The restaurant space was then sold to another individual, who opened Dimitre's. Dimitre's was then sold to Ayman Shkoukani and his brothers. Shkoukani accepted the terms of the lease agreement via assignment from Dimitre's' former owner. In 2004, the lease agreement expired. Defendant permitted Dimitre's to stay in the space, and Dimitre's began paying rent on a month-to-month basis.

Defendant argues that it cannot be held liable for any injuries to plaintiff because Dimitre's was a holdover tenant, which meant that it was required to adhere to the terms of the lease agreement Shoukani had assumed when he purchased Dimitre's. Defendant specifically points to a clause in the lease agreement regarding maintenance:

> The Tenant shall . . . at its own cost and expense, put, keep, replace and maintain in thorough repair and in good, clean, safe and substantial order and condition, and free from dirt, snow, ice, rubbish, and other obstructions or encumbrances, and to the satisfaction of the Landlord, the driveways, sidewalks, parking areas, yards, plantings, pavement, car stops, gutters and curbs in front of and adjacent to the restaurant and, generally, the property comprising the Premises.

A tenant under a lease agreement becomes a "holdover tenant" by remaining in a leased space after the expiration of the lease agreement. *TCG Detroit v City of Dearborn*, 261 Mich App 69, 88; 680 NW2d 24 (2004). However, regardless of Dimitre's status as a holdover tenant, defendant's potential liability for injuries to plaintiff ultimately depends on whether defendant exercised possession and control over the parking lot where plaintiff fell.

In this context, "possession" is defined as " '[t]he right under which one may exercise control over something to the exclusion of all others.' " *Derbabian v S & C Snow Plowing, Inc*, 249 Mich App 695, 703; 644 NW2d 779 (2002) (citation omitted). "Control" is defined as " 'exercis[ing] restraint or direction over' " *Id*. at 704 (citation omitted). In commercial settings, landlords and tenants may both have "a duty of care to keep the premises within their control reasonably safe from physical hazard." *Bailey v Schaaf*, 494 Mich 595, 605; 835 NW2d 413 (2013).

Despite the fact that commercial landlords can exercise possession and control over land rented by tenants (and therefore can be found liable for failing to maintain land in reasonably safe condition), defendant suggests that Dimitre's was required to perform *all* of the exterior maintenance for the restaurant space. Conversely, the record suggests that defendant assumed the responsibility for maintaining the common areas, including the parking lot where plaintiff fell. Shkoukani testified that defendant charged Dimitre's yearly for snow removal services and other expenses, dividing the cost among defendant's tenants based on their square footage of rental space. Jim Sage, the sole owner of defendant, testified that he hired T & J to remove snow and ice from the parking areas for the entire plaza where Dimitre's was located, and he billed his tenants for that service by attaching "common area maintenance" (CAM) charges to the total cost of rent for each space in the plaza.[5] The record further shows that defendant selected T & J as the snow maintenance service for the plaza, and all of the decisions related to the agreement between defendant and T & J were made by defendant and T & J. Dimitre's did not have any

---

[5] Sage testified that he has been using T & J for approximately 25 to 28 years, and that the terms of the agreement are that other than when there is only a "very minor" amount of snowfall, like a quarter inch, "[w]hen it snows, they plow, when it needs salting, they salt." Sage testified that defendant pays T & J for its services, and his records show that he issued CAM charges for the time frame in question (July 1, 2013 to June 30, 2014) for snow removal and salting in the amount of $6,725.

ability to give input regarding the agreement, nor could it give input regarding the cost of T & J's services or what defendant charged Dimitre's for those snow removal services. During the approximately ten years during which Shkoukani owned Dimitre's prior to the slip-and-fall at issue here, defendant had always handled the snow removal. Shkoukani was not aware that Dimitre's was supposedly responsible for removing snow from the parking lot, and he relied on T & J and defendant to maintain the outdoor common areas, with the exception of the front sidewalk. Dimitre's never individually contracted with T & J for snow removal services and instead relied on defendant to care for maintenance of the parking lot.

Our Supreme Court has held that both the commercial owner of a parking lot and the lessee of a parking lot may be "held liable for an invitee's injury that arose from a hazard on the parking lot." *Bailey*, 494 Mich at 607; see also *Siegel v Detroit City Ice & Fuel Co*, 324 Mich 205; 36 NW2d 719 (1949) (holding that a landlord and a commercial tenant were both liable for injury to the plaintiff because both had possession and control of the premises where the plaintiff was injured). However, even assuming that Dimitre's had a duty as a holdover tenant to adhere to the terms of the original lease agreement covering the restaurant space, defendant clearly exercised possession and control of the common areas by exclusively choosing to employ T & J and charging the plaza's tenants, including Dimitre's, a CAM fee for snow removal and salting services. The facts herein indicate that defendant possessed and controlled the parking lot to the degree necessary for it to potentially be held liable.

" '[P]ossession for purposes of premises liability does not turn on a theoretical or impending right of possession, but instead depends on the actual exercise of dominion and control over the property.' " *Derbabian*, 249 Mich App at 704, quoting *Kubczak v Chemical Bank & Trust Co*, 456 Mich 653, 661; 575 NW2d 745 (1998). In plaintiff's case, defendant was "the [entity] . . . in the best position to prevent plaintiff's injury," because it made itself solely responsible for major snow maintenance by hiring T & J. *Id*. at 705. "[E]ven if the [lease] agreement could be construed as granting [Dimitre's] the right to control the restaurant's maintenance, there is no evidence that [it] exercised that right" on the day that plaintiff fell. *Little v Howard Johnson Co*, 183 Mich App 675, 679; 455 NW2d 390 (1990); see also *Derbabian*, 249 Mich App at 704. Here, defendant retained exclusive control over the parking lot's snow removal. Accordingly, there is no question of fact regarding whether defendant exercised "dominion and control" over the parking lot—it did. *Derbabian*, 249 Mich App at 704. Therefore, defendant could be held liable for plaintiff's injuries as a result.

### III. OPEN & OBVIOUS DOCTRINE AND SPECIAL ASPECTS EXCEPTION

Defendant next argues that, even if it had possession and control of the parking lot, the trial court erred by denying its motion for summary disposition because the dangerous condition caused by the ice on the surface of the parking lot was open and obvious, and it was not effectively unavoidable. We agree with the former proposition, but not that latter, which we find to be a material question of fact for a jury to resolve.

To establish negligence in a premises liability action, a plaintiff must show " '(1) the defendant owed the plaintiff a duty, (2) the defendant breached that duty, (3) the breach was the proximate cause of the plaintiff's injury, and (4) the plaintiff suffered damages.' " *Mouzon v*

*Achievable Visions*, 308 Mich App 415, 418; 864 NW2d 606 (2014) (citations omitted). Plaintiff argues that defendant breached the duty of care owed to her as an invitee by failing to remove the dangerous condition posed by the ice in the parking lot. The parties do not dispute plaintiff's status as a business invitee.

Where a "plaintiff is a business invitee, the premises owner has a duty to exercise due care to protect the invitee from dangerous conditions." *Sanders v Perfecting Church*, 303 Mich App 1, 4; 840 NW2d 401 (2013). Landowners have a duty to warn invitees of dangerous conditions that they are not otherwise likely to discover, and to "maintain the premises in a reasonably safe condition." *Bailey*, 494 Mich at 606. However, a landowner is generally not required to protect or warn an invitee if the danger is "known to the invitee or [is] *so obvious* that the invitee might reasonably be expected to discover [it]." *Hoffner v Lanctoe*, 492 Mich 450, 484; 821 NW2d 88 (2012) (quotation marks and citation omitted). A condition is open and obvious if "an average user with ordinary intelligence [would] have been able to discover the danger and the risk presented upon casual inspection." *Bialick v Megan Mary, Inc*, 286 Mich App 359, 363; 780 NW2d 599 (2009).

"Generally, the hazard presented by snow and ice is open and obvious, and the landowner has no duty to warn of or remove the hazard." *Royce v Chatwell Club Apartments*, 276 Mich App 389, 392; 740 NW2d 547 (2007). Plaintiff argues on appeal that the presence of ice in the parking lot was not open and obvious because it was dark outside when she arrived at Dimitre's, and the only light in the parking lot came from a small overhead lamp by the back door of Grand Dimitre's. However, at her deposition, plaintiff specifically stated that she *did* see the snow and ice in the prevailing lighting conditions:

> *Q.* Are there lights on the premises?
>
> *A.* The side of the premises, yes. The front, I have no idea.
>
> *Q.* What about the back?
>
> *A.* The back lighting was—they had a night light over the back door.
>
> *Q.* Nonetheless, you were still able to see the snow and ice, right?
>
> *A.* Well, if you walk into your bathroom and you have a night light, that is how bright that light was. It just [lit] the door. It didn't come out into the parking lot.
>
> *Q.* I see. But again, nonetheless, you were still able to see the ice, right?
>
> *A.* Yes.

Plaintiff further testified that she recognized that the entire parking lot was covered in snow and ice and knew that it could be slippery:

> *Q.* Did you see the snow coming into the parking lot –

*A.* Yes.

*Q.* – on the – let me just finish the question. Did you see the snow coming into the parking lot?

*A.* Yes.

*Q.* Did you know it might be slippery in the parking lot?

*A.* Yes.

\* \* \*

*Q.* Where were you looking when you fell?

*A.* On the ground.

*Q.* Could you see the ice?

*A.* Yes.

*Q.* Could you see pavement?

*A.* No.

*Q.* How much ice would you say you were able to see?

*A.* The whole parking lot.

The fact that ice was present on the surface of the parking lot was clearly open and obvious upon casual inspection based on plaintiff's own testimony that she was able to observe that the entire parking lot was covered in a layer of ice and she recognized that such conditions posed a slip hazard, despite the fact that the parking lot was dark. There is nothing in the record to suggest that a reasonable person in plaintiff's position would not have made the same observations. See *Janson v Sajewski Funeral Home, Inc*, 486 Mich 934, 935; 782 NW2d 201 (2010). Further, even if the area near the drain where plaintiff fell was icy, it was no different in character than the rest of the parking lot, which plaintiff could see was covered in a layer of snow and ice. Thus, the trial court erred when it failed to determine that the hazard was open and obvious.

However, an open and obvious condition may nevertheless result in liability if the condition possesses special aspects that make it unreasonably dangerous. *Lugo v Ameritech Corp*, 464 Mich 512, 517; 629 NW2d 384 (2001). Special aspects "differentiate [a] risk from typical open and obvious risks so as to create an unreasonable risk of harm." *Id*. at 518. A "special aspect" is a condition that either "impose[s] an unreasonably high risk of severe harm," or that is "effectively unavoidable." *Id*. In attempting to define a situation in which an individual would be exposed to an unreasonably high risk of severe harm, our Supreme Court has postulated that an unguarded, 30-foot-deep hole in a parking lot would constitute one such

special aspect. A large, deep hole in a parking lot would certainly be open and obvious, but would still contain special aspects that would result in exposure to an unreasonable risk of severe harm because falling in the hole would likely result in severe injury or death. *Id*.

Although the ice may have been slippery enough to be unsafe for plaintiff to walk on, our Supreme Court's standard for determining conditions that pose an unreasonable risk of severe harm is exceptionally high, and generally, the presence of ice and snow do not meet that standard. *Lymon v Freedland*, 314 Mich App 746, 759-760; 887 NW2d 456 (2016). "The risk of slipping and falling on ice is not sufficiently similar to those special aspects discussed in *Lugo* to constitute a *uniquely high* likelihood or severity of harm and remove the condition from the open and obvious danger doctrine." *Royce*, 276 Mich App at 395-396. Similarly, the fact that there was ice on the ground in the parking lot does not, in and of itself, give rise to a special aspect that creates an unreasonable risk of harm as contemplated in *Lugo*.

Regarding whether a condition is "effectively unavoidable," the condition must be "unavoidable or inescapable . . . for all practical purposes." *Hoffner*, 492 Mich at 468. "Unavoidability is characterized by an inability to be avoided, an inescapable result, or the inevitability of a given outcome." *Id*. Thus, the phrase "effectively unavoidable" suggests that plaintiff must have been "required or compelled to confront a dangerous hazard." *Id*. at 468-469. In *Lugo*, our Supreme Court gave the example of "a commercial building with only one exit . . . where the floor is covered with standing water" as a hypothetical illustration of an unavoidable condition because an individual would be required to walk through the standing water in order to exit the building. *Lugo*, 464 Mich at 518.

Plaintiff argues that the icy parking lot was effectively unavoidable because she did not have a means of getting in through the front door, and in any event, the parking area in front of the building was just as slippery and equally as dangerous as the rear area. The other waitress who arrived before plaintiff had to "shimmy" her way in. Defendant argues that plaintiff offers no evidence that she would have faced reprisal or punishment for parking somewhere other than the rear lot and entering through the front door of the restaurant.

Viewed in a light most favorable to plaintiff, the record evidence creates a genuine issue of material fact as to whether any part of the parking lot was in a reasonably safe condition to traverse in order to enter the restaurant and report for work. As noted herein, in her deposition plaintiff testified that the "whole parking lot" was "[a] sheet of white ice," a "solid block," and "a solid sheet of white." Buck, who entered through the front door, testified that the parking lot was "a sheet of ice with water on top. Snow, ice, water." From what she remembered, there was "snow, ice and water pretty much through the parking lot," and when asked if any part of the parking lot did not have that condition present, she responded, "No, it was covered[,]" as was the sidewalk. Buck herself had difficulty entering through the front door and had to "shimmy." The fact that Buck did not also fall does not equate to there being an effectively avoidable hazard, just that she managed to dodge injury caused by the presenting hazard. Photographs of the restaurant reveal that the "back" parking lot is actually on the side of the building and adjacent to the front parking lot; in other words, they are part of the same parking lot. And other than the

snow pile conditions blocking several spots in the back, the record supports a finding that the entire parking lot presented an effectively unavoidable hazard of packed snow and ice.[6]

We affirm the trial court and remand for further proceedings. We do not retain jurisdiction.

/s/ Jane M. Beckering
/s/ Douglas B. Shapiro

---

[6] We disagree with our dissenting colleague's contention that caselaw in this state requires a different conclusion regarding whether the presenting hazard was effectively unavoidable. As the Supreme Court pointed out in *Hoffner*, "[i]n Michigan, a premises possessor owes a duty to use reasonable care to protect invitees from an unreasonable risk of harm caused by dangerous conditions on the premises, *including snow and ice conditions.*" *Hoffner*, 492 Mich at 455 (emphasis added). *Hoffner* rejected the idea that a hazard is effectively unavoidable simply because a plaintiff has a business interest in entering the premises. *Id*. As the Supreme Court pointed out when discussing the implications of its ruling in *Perkoviq v Delcor Homes-Lake Shore Pointe Ltd*, 466 Mich 11; 643 NW2d 212 (2002), "it cannot be said that compulsion to confront a hazard by the requirement of employment is any less 'avoidable' than the need to confront a hazard in order to enjoy the privileges provided by a contractual relationship, such as a membership in a fitness club. *Id*. at 472. "Neither possessing a right to use services, nor an invitee's subjective need or desire to use services, heightens a landowner's duties to remove or warn of hazards or affects an invitee's choice whether to confront a hazard. To conclude otherwise would impermissibly shift the focus from an objective examination of the *premises* to an examination of the subjective beliefs of the *invitee.*" *Hoffner*, 492 Mich at 472. Rather, an effectively unavoidable condition must be an inherently dangerous hazard that a person is inescapably required to confront under the circumstances. *Id*. at 456. The "touchstone" for permitting recovery under the "special aspects" exception to the open and obvious doctrine is the unreasonableness of the hazard. *Id*. at 472. Thus, we should not define whether a duty exists by the needs of the person seeking to use the property. Rather, we should define whether a duty exists by the unreasonableness of the hazard. Here, record evidence supports a finding that defendant's entire parking lot had become a sheet of white ice, or one big block of ice, due to the chronic accumulation over two months of fresh snow being packed down by cars, arrival of a snowplow after the snow had been packed down, such that the snow could not be fully removed, and the complete failure to salt the parking lot all winter. Put simply, the hazard encompassed the entire premises and it was effectively unavoidable for anyone and everyone, whether coming or going. It simply cannot be the law that a premises owner can render an all-encompassing hazard on the property "effectively unavoidable" by claiming that no one should come near the property.

-11-